(97 South. 918)

ALABAMA FUEL & IRON CO. v. MINYARD et al. (7 Div. 208.)

(Supreme Court of Alabama. Nov. 8, 1923.)

1. Master and servant ⟪⇒259(4)—Count for negligence of mine superintendent giving order held sufficient.

In suit for death of a mine worker from an explosion of gas, a count charging injury to be result of negligence of the superintendent in negligently ordering the intestate to work in a dangerous place without warning him of the danger, *held* not demurrable as failing to show breach of duty and intestate's ignorance of the presence of gas.

2. Master and servant ⟪⇒286(40), 289(19)— Negligence and contributory negligence held for jury on evidence as to gas explosion in mine.

In action for death of a miner, caused by a gas explosion in a cross-cut between a heading and its parallel air course, evidence as to whether the mine foreman was negligent in warning deceased of danger of encountering gas, and whether deceased was contributorily negligent in going into the cross-cut, notwithstanding his knowledge of the presence of gas in the face of the heading, *held* for jury.

3. Master and servant ⟪⇒276(10)—Miner shown to be within scope of superintendent's orders.

In action for death of a mine worker from gas exploding in a cross-cut, evidence *held* to show deceased when entering the cross-cut was not acting outside the scope of the superintendent's order to do certain work in the cross-cut.

4. Master and servant ⟪⇒295(6)—Instruction on miner's assumption of risk held misleading in its application to foreman's negligence.

In action for death of a miner from a gas explosion in a cross-cut, where it was alleged that the foreman ordered deceased to go into the cross-cut without warning him as to the gas, an instruction that, if the evidence was believed, deceased assumed the risk of all dangers inherent in his occupation as a coal miner, was misleading in its application to the negligence imputed to the foreman.

5. Trial ⟪⇒260(1)—Refusal of instructions covered by instructions given not error.

There was no prejudice in refusing charges, the substance and principles of which were covered by given charges.

6. Master and servant ⟪⇒296(1)—Instruction permitting recovery unless "palpably" negligent held erroneous.

In action for death of a miner from a gas explosion, an instruction that plaintiff could recover unless the jury thought "that his conduct was so 'palpably' negligent, and that his negligence contributed to his injury, to that extent he wouldn't be entitled to recover," was erroneous, as imposing too high a degree of proof on the issue of contributory negligence; "palpably" meaning obviously or readily apparent.

7. Trial ⟪⇒296(8)—Error in instruction not cured by another correct instruction.

An instruction imposing too high a degree of proof on an issue is an error for which the judgment must be reversed, though the rule was elsewhere correctly stated by the court.

8. Evidence ⟪⇒383(11)—Mortality tables not conclusive proof of expectancy of life.

Standard mortality tables cannot prove conclusively what is one's expectancy of life, but show the probability of the duration of life at any given age, based on the law of averages.

9. Appeal and error ⟪⇒1064(2)—Trial ⟪⇒194 (20)—Instruction that damages should be based on life expectancy invasive of jury's province.

In action for death, instruction that damages, if awarded, should be based on a life expectancy of 27 years, was invasive of the jury's province, with probably prejudicial effect.

Appeal from Circuit Court, St. Clair County; O. A. Steele, Judge.

Action by Cora Minyard and George Howton, as administrators of the estate of W. L. Minyard, deceased, against the Alabama Fuel & Iron Company. From a judgment

for plaintiffs, defendant appeals. Reversed and remanded.

Count 1 alleges that:

"On the 7th day of February, 1919, the defendant was operating a coal mine in St. Clair county, Ala., to wit, at or near Acmar; that on said day plaintiff's intestate, W. L. Minyard, was in the service or employment of the defendant in said mine, and while engaged in or about the work of the defendant in said mine, for which he was employed, an explosion occurred in said mine, and as a proximate consequence thereof plaintiff's intestate was so injured that he died on the 12th day of February, 1919; hence this suit.

"Plaintiffs aver that their said intestate was injured on the occasion aforesaid, and his death was caused, by reason and as a proximate consequence of the negligence of a person in the service or employment of the defendant, who had superintendence intrusted to him, whilst in the exercise of such superintendence, viz. George Echols, the person in the service or employment of the defendant, and intrusted by it with the exercise of superintendence, negligently, in the exercise of such superintendence, failed to provide and maintain in said mine ample means of ventilation for the circulation of air through the main entry and all other working places in said mine, to an extent that would dilute, carry off, and render harmless the explosive gases generated in said mine, and properly conducted to all working places in said mine, and the plaintiffs aver, by reason thereof, gases generated in said mine became ignited and exploded, killing the plaintiff's said intestate."

Count H alleges the facts as in count 1 and concludes:

"And the plaintiffs aver that their said intestate was injured on the occasion aforesaid, and his death was proximately caused by the negligence of one George Echols, whose name to the plaintiff is otherwise unknown, who was then and there in the service or employment of the defendant, and to whose orders and directions the intestate at the time of his said injuries was bound to conform and did conform, and such injuries and death resulted from his having so conformed. And the plaintiffs say that the said negligence of the said George Echols consisted in this: That he then and there negligently ordered or directed the plaintiff's intestate, W. L. Minyard, to go into a cross-cut between the fourth right heading and the air course, and engage at work there, when he knew, or by the exercise of reasonable care and prudence would have known, that gases obtained in said working places and in said cross-cut in dangerous quantities, which made it highly dangerous for intestate to be engaged in or about said work that he was there required by defendant to do."

Count X is the same as count H, except it concludes with a charge of negligence as follows:

"George Echols negligently ordered or directed intestate to go into the third cross-cut between the fourth right heading and the air course, without properly and sufficiently warning or informing him as to said explosive gas."

Demurrers attacked the sufficiency of count X, chiefly on the ground that no breach of duty was shown, in the absence of allegation that the intestate was ignorant of the presence of gas at the place in question. These demurrers were overruled, and trial was had on a plea of the general issue "in short by consent."

Plaintiff's intestate was killed by a gas explosion in a cross-cut between a heading and its parallel air course. The heading had been run some distance beyond the air course, and, when a gas feeder was uncovered near the face of the heading, the last or fourth cross-cut was ineffective for the ventilation and removal of this gas, and resort was had temporarily to what is called a "wing curtain" across the heading. Preliminary to the extension of the air course, the intestate and one Hawkins were sent by the mine foreman, Echols, into this fourth right heading, with instructions to remove the brattice which closed up the third cross-cut, and blast away two of its corners, one on the heading and one on the air course side, so as to permit a tramway to enter the air course at that point, for the purpose of removing the materials to be excavated in making the air course extension. The rib between heading and air course was about 15 feet in thickness.

Hawkins was an ordinary miner, but the intestate had for several months been a "safety man's" helper, according to some of the testimony, or a "brattice man," according to other witnesses. As safety man's helper, it was intestate's duty to go around and help in clearing out gas from places marked as having gas, after first testing for gas with a safety lamp provided for that purpose. But as brattice man his duty was merely to brattice up or cover cross-cuts, as the extension of the headings and air courses required it, and in so doing there is nothing in the evidence to show that he would necessarily have acquired, or had acquired, any expert knowledge of the qualities and dangers of gas in such a place as this, other than ordinary experience would teach.

The effect of removing the brattice and thereby opening the third cross-cut, as actually done by the intestate and Hawkins, was to short-circuit the air, which had been driven around the face of the heading and through the fourth cross-cut into the air course, and to send it instead through this third cross-cut; and this, of course, left the gas to accumulate above it in the face of the heading. Hawkins testified:

"Mr. Echols put us to work in the cross-cut. When we shot first from this corner over here (indicating), and our second shot was on that corner over there (indicating), a little further back in that corner where we had drilled

the holes for our third shot before Mr. Echols came down and gave us instructions about shooting. We shot this second corner off here. And then we went back here and widened it still more; and it was here that we were waiting, to advise with him about shooting, when he told us about, 'Hell! yes; everything is all right; go ahead and shoot,' and 'then hang up your curtain here to keep the gas from coming back on you.' I did not know anything about a feeder of gas up here in the heading (indicating). When Mr. Echols came down, he did not tell either me or Mr. Minyard about there being a feeder of gas pouring into the mine up there in the face of the mine. He did not tell me, or Mr. Minyard in my presence, to take our safety lamp and go up there and make tests for gas before proceeding with our work. I did not hear him say in any way, shape, or form that the place was dangerous or not dangerous. When he came down there, he sat down and talked a few words with us. What I have already said is all he said. The explosion occurred about 3:14. We quit working and go out at 4 o'clock."

Hawkins further testified:

"Mr. Echols was our foreman. * * * He directed the work; instructed us what to do and how to do it. We were subject to his orders, Mr. Minyard and myself."

After completing the shots in the third cross-cut, they hung a canvas brattice across it on the heading side, which restored the circulation above, and drove the accumulated gas into the air course, and some of it "pocketed" in the mouth of the third cross-cut. As to the explosion, Hawkins testified:

"There was a few minutes passed after I hung up this brattice, and then * * * we all, without him making any inspection he started through here first. He went into that place with an open light, through the curtain brattice, and I went after him. And when we got through there, somewhere towards the air course there, the explosion occurred."

The intestate was provided with a safety lamp, which would show the presence of gas and would not explode it, and which was at the time hanging on a tram car near at hand. Before he and Hawkins began their work there, the intestate had used it in making an examination of that part of the heading. In putting up the wing curtain before that time, frequent tests were made of the gas in the heading with safety lamps, and the intestate was present as a helper.

Echols, the mine foreman, testified that the intestate was at the time safety man and brattice man, and that he was familiar with the movement of the air in the mine. Echols further testified:

"I had been mine foreman in charge of the work there for seven days. As mine foreman it was my duty to take all precautionary measures to make the mine as safe as was reasonably possible for me to do. I sent these boys in there to do that work, without going in there to make tests myself to ascertain its condition;

as a matter of fact I took the fire boss' report on the condition down there."

Defendant's witness Lawrence, who was Echols' predecessor as mine foreman up to a week before the explosion, testified:

"This operation here, if it [the brattice in the third cross-cut] was knocked out and left out from 7:30 in the morning until 3:13 in the afternoon, it would be perfectly obvious to the mine foreman, to a man of my experience, that it would be extremely dangerous for a man to come through there. Every precaution would be necessary to protect a man from a situation like that. As mine foreman, it was Echols' duty to protect the safety of these men [the intestate and Hawkins] in so far as it was possible for him to do it, and to instruct them not to encounter this situation."

Charge 8, refused to defendant, is as follows:

"(8) I charge you, gentlemen of the jury, that if you believe the evidence Walter Minyard assumed the risks of all the dangers inherent in his occupation as coal miner."

The verdict was for plaintiff, with judgment accordingly, from which defendant appeals.

Percy, Benners & Burr, of Birmingham, for appellant.

A failure to warn count must set out facts showing a duty to warn. Horan v. Gray & Dudley Hdw. Co., 159 Ala. 159, 48 South. 1029; T. C. I. Co. v. Williamson, 164 Ala. 54, 51 South. 144. An employé subjecting himself to an obviously great danger is guilty of contributory negligence, even though in obeying the command of a superior. Coosa Mfg. Co. v. Williams, 133 Ala. 606, 32 South. 232; Ritch v. Kilby Frog & Switch Co., 164 Ala. 131, 51 South. 377. It was error to charge that plaintiff could recover unless his conduct was palpably negligent. B. R., L. & P. Co. v. Bynum, 139 Ala. 389, 36 South. 736.

Mathews & Mathews, of Bessemer, and Hill, Hill, Whiting & Thomas, of Montgomery, for appellees.

It is the imperative duty of the operator or superintendent of a mine to ventilate and render it free of noxious gases. Acts 1911, p. 515; Walker v. Birmingham C. & I. Co., 184 Ala. 425, 63 South. 1012; Segrest v. Roden Coal Co., 201 Ala. 382, 78 South. 756; Ala. F. & I. Co. v. Minyard, 205 Ala. 140, 88 South. 146; S. S. S. & I. Co. v. Green, 159 Ala. 182, 49 South. 301; Bessemer L. & I. Co. v. Campbell, 121 Ala. 50, 25 South. 793, 77 Am. St. Rep. 17; Republic Iron & Steel Co. v. Williams, 168 Ala. 612, 53 South. 76. The servant will not be held guilty of negligence in pursuing the work he is directed by the master or superior to do. A. B. & A. v. Reynolds, 201 Ala. 520, 78 South. 875; Birmingham M. & C. Co. v. Skelton, 149 Ala.

465, 43 South. 110; Pioneer M. & M. Co. v. Smith, 150 Ala. 356, 43 South. 561; Coosa Pipe Co. v. Poindexter, 182 Ala. 656, 62 South. 104.

SOMERVILLE, J. [1] Under our previous decisions, count X of the complaint must be held sufficient as against the several grounds of demurrer. Republic I. & S. Co. v. Williams, 168 Ala. 612, 53 South. 76; Wilson v. Gulf States Steel Co., 194 Ala. 311, 69 South. 921; Republic I. & S. Co. v. Harris, 202 Ala. 344, 80 South. 426. Appellant cites to the contrary the cases of Tenn., etc., Co. v. Williamson, 164 Ala. 54, 51 South. 144, and Horan v. Gray, etc., Co., 159 Ala. 159, 48 South. 1029. The first of these deals with a complaint drawn, as was count X here, under the third subdivision of the Employers' Act (Code, § 3910); but there the count demurred to did not charge that the order was negligently given. This distinguishing feature of that case was fully discussed by Mr. Justice Sayre in Republic I. & S. Co. v. Williams, 168 Ala. 612, 53 South. 76. The case of Horan v. Gray, etc., Co., 159 Ala. 159, 48 South. 1029, did not involve the giving of a negligent order by a superintendent, and is therefore inapt.

[2] Appellant's chief contention is that it was entitled to the general affirmative charge on the whole evidence, whether on the theory that no breach of duty to the intestate was shown, or that, in any case, the intestate was himself guilty of contributory negligence sufficient as a matter of law to bar a recovery. We have examined the evidence with studious care, and we think it presented two essential issues of fact, upon which the jury passed in reaching their verdict: (1) Was it the duty of defendant's mine foreman, Echols. in ordering the intestate to work in the third cross-cut, and to hang the curtain brattice reinstating the circulation through the gas-laden area above, to warn him of the danger of encountering gas in dangerous quantities thereafter in the cross-cut itself? (2) Did the intestate, by reason alone of his service and experience as brattice man, have sufficient knowledge of the danger inherent in the situation to make his conduct in going into the cross-cut, after hanging the curtain, an obviously dangerous act, amounting to contributory negligence?

As to the first question, the testimony of Lawrence was undoubtedly sufficient to support a finding of breach of duty by Echols. It is true that Echols says he instructed the intestate to make tests of the gas as often as necessary with his safety lamps, but that was not the equivalent of warning him of the specific danger he encountered in the cross-cut immediately after hanging the brattice curtain and restoring the circulation through the heading above. Moreover, the testimony of plaintiff's witness Hawkins tended strongly to negative the giving of even that precautionary instruction.

As to the second question, notwithstanding the intestate's knowledge of the presence of gas in dangerous quantities in the face of the heading, and of the general dangers resulting from such a situation as was there presented, there is nothing in the evidence to show, as a matter of conclusive fact, that he knew enough about the accumulation and movements of gas, in connection with a suspended and restored circulation of the air, to stamp his act as negligent as a matter of law. The jury might have so found it, but they were not bound to do so.

[3] Another contention of appellant's is that the evidence fails to show that Echols ordered the intestate to go into the third cross-cut in the manner and at the time he did, and hence that essential allegation of counts H and X is not proven. The order given was general—to do certain work in this cross-cut—and the intestate and his helper were there engaged in doing it, and there is nothing in the evidence to force the conclusion that, when they went under the curtain towards the air course end of the cross-cut, they were acting outside the scope of the order, or were not performing some minor task or duty incidental to the main work, before leaving the heading for the day.

We do not find anything in the evidence to support a finding that defendant, or any of its servants, was guilty of negligence in the operation of this mine, or in its system of ventilation, or in the mode of procedure adopted by the mine foreman after the gas feeder was uncovered near the face of the heading.

[4] Refused charge 8 is clearly misleading in its application to the negligence here imputed to the mine foreman Echols.

[5] The substance and the principles of the other refused charges are sufficiently covered by given charges 2, 4, 5, 6, and 7, and the general oral charge. We do not think there was any prejudice to defendant in this respect.

[6, 7] Excerpt No. 4 from the oral charge, to which the exception was duly taken, instructs the jury that plaintiff would be entitled to recover (on certain findings of fact) unless they thought "that his conduct was so palpably negligent, and that his negligence contributed to his injury, to that extent he wouldn't be entitled to recover." "Palpably" means obviously or readily apparent, and imposes too high a degree of proof on the issue of contributory negligence; and though the rule was elsewhere correctly stated by the trial judge, it is impossible for us to know which statement the jury accepted and followed as their guide. We have often held in such cases that the error must reverse the judgment.

[8] Excerpt 5 from the oral charge, to which exception was duly taken, embodies an unquestionable error. Standard mortality tables do not prove conclusively what is one's expectancy of life. They show merely the probability of the duration of life at any given age, based on the law of averages. The normal probability may be qualified by the physical condition of the injured person. his general health, his personal habits, and the character of his employment. M. L. C. & Ry. Co. v. Chambliss, 97 Ala. 171, 175. 11 South. 897. And hence the mortality tables are merely evidence to be considered by the jury in connection with other relevant evidence. Birmingham Mineral R. R. Co. v. Wilmer, 97 Ala. 165, 170, 11 South. 887.

[9] In instructing the jury that damages, if awarded, should be based on a life expectancy of 27 years, the trial court invaded the province of the jury with probably prejudicial effect, as held in the recent case of Little Cahaba Coal Co. v. Arnold, 206 Ala. 598, 91 South. 586.

Let the judgment be reversed, and the cause remanded for another trial.

Reversed and remanded.

ANDERSON, C. J., and THOMAS and BOULDIN, JJ., concur.

THOMAS, J., limits his concurrence in the reversal to the error found in excerpt No. 4 of the oral charge.

THOMAS, J. (concurring). I rest my concurrence of reversal as indicated in the opinion. I cannot concur in the treatment given that part of the oral charge as follows:

"In other words, you take his earnings, the amount of his own expenses, and the balance of that, she is entitled to such a sum as, put at interest, will produce for her the amount that he was contributing to her and her children's support, for the 27 years, at such a rate as that the principal, will be exhausted at the end of the 27 years."

The evidence shows:

"He was 41 years of age at the time of his death. He was in good. health and worked regularly. He was making about $6 per day at the time of his death. He spent upon himself— that is, his personal expenses were—about $250 per year. He brought the rest of the money home to me. I spent it on the family. He left six children; the oldest is 16 and the youngest one 3 years old."

In the absence of evidence to the contrary, or tending to rebut the presumption of the life expectancy shown by the mortality table in evidence, the court had the right to instruct the jury as was done with regard to the life expectancy of plaintiff's intestate. The charge shown by the record in Marbury Lumber Co. v. Heinege, 204 Ala. 241, 85 South. 453, is somewhat like that for consideration here, except that no exception was there reserved to the instruction given. See Thomas Furnace Co. v. Carroll, 204 Ala. 263, 267, 85 South. 455; L. & N. R. Co. v. Porter, 205 Ala. 131, 87 South. 288; Alabama Co. v. Brown, 207 Ala. 18, 29, 92 South. 490; Reiter-Connolly Mfg. Co. v. Hamlin, 144 Ala. 192, 40 South. 280; L. & N. R. Co. v. Trammell, 93 Ala. 350, 9 South. 870.